IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MARCUS L. CLARK,                    )        CASE NO. 3:19CV1175
                                    )
                   Petitioner,      )        JUDGE DONALD C. NUGENT
                                    )
         v.                         )        MAGISTRATE JUDGE
                                    )        KATHLEEN B. BURKE
STATE OF OHIO,                      )
                                    )
                                    )        **REPORT & RECOMMENDATION**
                   Respondent.      )

Petitioner Marcus L. Clark ("Petitioner" or "Clark") brings this habeas corpus action pursuant to 28 U.S.C. § 2254.  Doc. 1.  Clark was detained at the Mansfield Correctional Institution, having been found guilty by a Lucas County, Ohio, Court of Common Pleas jury of one count of menacing by stalking.  *State v. Clark,* Case No. G-4801-CR-0201603039 (Lucas Cty. Common Pleas Ct., filed Feb. 3, 2017).  The trial court sentenced Clark to 17 months in prison and three years of post-release control.[1]  Doc. 14-1, pp. 85-86.

On April 26, 2019, Clark filed his Petition for Writ of Habeas Corpus setting forth four grounds for relief.  Doc. 1, pp. 6-11.  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  As set forth more fully below, Clark's grounds for relief are procedurally defaulted, not cognizable, and/or fail on the merits.  Thus, the undersigned recommends that his Petition for Writ of Habeas Corpus (Doc. 1) be **DISMISSED in part and DENIED in part**.[2]

## I.  Factual and Procedural Background

---

[1] Clark is no longer incarcerated.  Nevertheless, his post-release control satisfies the "in custody" requirement of § 2254(b)(1).  *Rose v. Warden, Chillicothe Corr. Inst.*, 2017 WL 4180005, at *4 (S.D.Oh. June 12, 2017); *United States v. Sandles*, 469 F.3d 508, 517-18 (6th Cir. 2006).

[2] The grounds in the petition that are procedurally defaulted and not cognizable results in a dismissal; the ground in the petition that is addressed on the merits result in a denial.

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008).

The following summary of underlying facts is taken from the opinion of the Lucas County Court of Appeals, Sixth Appellate District of Ohio:

{¶ 2} On November 8, 2016, Clark was indicted on one count of menacing by stalking, a violation of R.C. 2903.211(A)(1). The indictment included a penalty enhancement under R.C. 2903.211(B)(2)(e) that raised the menacing by stalking charge from a first-degree misdemeanor to a fourth-degree felony and required the state to prove that "[t]he offender has a history of violence toward the victim or any other person or a history of other violent acts toward the victim or any other person." During discovery, the state told Clark's attorney that it intended to rely on two of Clark's prior convictions to prove the history-of-violence element. The state later learned that the prior convictions did not involve B.P., the victim in this case. At a pretrial on January 10, 2017, the state told the defense that the prior convictions involved different victims and that it would not use the convictions to prove the history-of-violence element. Instead, the state intended to rely only on B.P.'s testimony to show that Clark had a history of violence with B.P.

{¶ 3} On January 17, 2017, Clark filed three motions: a request for a bill of particulars, a "motion for notice of intent to use evidence," and a discovery demand. All three motions sought information from the state regarding its ability to prove the history-of-violence element. Clark claimed that he had not been provided with any discovery relating to B.P.'s allegations of past violence. In response, the state asked Detective Mary Jo Jaggers of the Toledo Police Department, who was the detective assigned to the case, to conduct a follow up interview with B.P. Detective Jaggers interviewed B.P. on January 19, 2017, and filed her supplemental report memorializing the interview on January 20, 2017. The state provided the report to Clark on January 23, 2017.

{¶ 4} The court held another pretrial on January 24, 2017, at which Clark moved to dismiss the indictment because of the state's Crim.R. 16 violations, or alternatively, for exclusion of B.P.'s testimony regarding Clark's history of violence with her. The state moved for a continuance of the trial scheduled to begin later that day, which the court granted over Clark's objection. The court also ordered the parties to brief the dismissal issue by January 26, 2017.

{¶ 5} On January 25, 2017, the state filed its responses to Clark's January 17 motions, including a notice of intent to use evidence that outlined B.P.'s anticipated trial testimony. The same day, Clark filed a motion to dismiss that expanded upon the arguments he made at the January 24 pretrial. He argued that the state's failure to provide him with evidence to support the history-of-violence element until the day before trial violated Crim.R. 16

and that the appropriate sanction was either dismissal of the indictment, dismissal of the history-of-violence element of the indictment, or exclusion of B.P.'s testimony regarding the history of violence between her and Clark.

{¶ 6} The state responded on January 26, 2017, arguing that dismissal was not an appropriate sanction because any Crim.R. 16 violation it might have committed was not willful, Clark suffered only minor prejudice, and a continuance of the trial was the least severe remedy for any discovery violation.

{¶ 7} Also on January 26, the court held a hearing on the motion to dismiss. At the hearing, the court tentatively set a new trial date for January 31, 2017. The court did not rule on Clark's January 25 motion, prompting Clark to file a second motion to dismiss on January 30, 2017. The January 30 motion alleged additional discovery violations by the state. Clark again sought sanctions in the form of dismissal of the indictment or exclusion of B.P.'s testimony regarding the history of violence between her and Clark.

{¶ 8} The court held another hearing on January 30 (the day before the scheduled jury trial) at which it addressed the new motion to dismiss. The court took the issues of dismissal and sanctions under advisement and confirmed the January 31 trial date.

{¶ 9} Prior to trial on January 31, 2017, the court ruled that the state's conduct was not sufficient to justify dismissing the indictment. After confirming with defense counsel that he was ready to proceed with trial, the court decided not to issue any sanctions against the state. The court also noted its continuance of the January 24 trial date to January 31, which provided the defense with additional time to prepare to defend against the evidence in the January 20 police report and therefore remedied any prejudice Clark might have suffered.

{¶ 10} At trial, B.P. was the state's first witness. She testified that she and Clark had lived together and had an eight-year relationship that she ended in August 2016. She described the relationship as "very violent, abusive. A lot of putdowns, a lot of mental abuse." This included death threats, beatings, and abuse of B.P.'s dogs. B.P. said that she stayed in her relationship with Clark for more than eight years because she was scared of him and afraid that he would harm her if she left. Although B.P. testified that there were numerous incidents of abuse that happened during her relationship with Clark, she addressed only four of them in depth.

{¶ 11} The first incident happened approximately one month into her relationship with Clark. She said that he strangled her, which left a scar on her neck. B.P. did not call the police or seek medical care because of this incident because she was afraid and did not know what to do.

{¶ 12} The next incident of violence that she detailed was a beating in July 2007, during which Clark gave her a black eye. She also said that she received so many black eyes during her relationship with Clark that her left eye looks permanently blackened. Once again, B.P. did not report the incident to police or seek medical attention.

{¶ 13} The third incident happened in April 2009. B.P. testified that Clark "stomped my face out" and cut her hand and leg with a knife. B.P.'s injuries were so severe that Clark permitted her to go to the hospital for treatment. B.P. claimed that Clark told her to report that she was injured when a group of men attacked her as she was walking to the store, which she reported to hospital staff. When police officers came to the hospital to investigate, B.P. told them the same story. She testified that there was no follow-up investigation or prosecution based on her police report. She claimed that she did not tell the hospital staff or the police what really happened because Clark had threatened to kill her before and she was afraid of him.

{¶ 14} The final incident B.P. detailed happened later in 2009, shortly after B.P.'s mother died. She testified that Clark caused extensive damage to their house one night while he was angry. This included destroying some flowers that had belonged to B.P.'s mother and throwing her mother's picture in the dumpster.

{¶ 15} After B.P. left Clark in August 2016, she testified that he "continuously" made unwanted calls to her work cellphone and sent her unwanted text messages, to the point that she obtained a civil protection order ("CPO") against him to prevent him from contacting her. She also blocked his cellphone number so that she would not receive any phone calls or text messages sent from his number. She took the threats in the text messages very seriously and was "in hiding for months." Clark repeatedly threatened to kill B.P., and she believed that he would follow through on his threats.

{¶ 16} In the afternoon of October 17, 2016, B.P.'s tires were slashed while her car was parked at her office. Her car was the only one in the parking lot that was vandalized. There were no witnesses or video that documented who slashed B.P.'s tires, but B.P. believed that Clark did it in retaliation for her blocking his cellphone number earlier that day. B.P. called the Sylvania Township Police Department ("STPD") to report the damage. Officers responded and took a report, but no charges were filed. B.P. testified that she told police when they responded that she was afraid of Clark and that he was going to get more violent as a result of her involving police.

{¶ 17} Beginning the evening of October 17 and continuing through October 31, 2016, B.P. received multiple text messages on her work cellphone from phone numbers that she did not recognize. Despite the messages coming from unknown numbers, B.P. attributed them to Clark because she knew his speech patterns and he had made similar threats to her before. The messages B.P. received on October 17 included the statements "You are so dead bitch" and "The police can't help you hoe??! [sic]." There was also a message telling B.P. not to go to her office because "you are gonna [sic] have it bad * * *" and a message that B.P. interpreted as threatening her daughter, grandchildren, and ex-husband. B.P. reported the threatening messages to the police around 11:00 p.m. that night. She said that she never received threatening text messages before she left Clark and has not received any threatening messages since the criminal case against Clark was filed.

{¶ 18} Later, on a Sunday,[1] B.P. received more threatening text messages from the unknown phone number. The messages called her a "Dead bitch," accused her of cheating, and threatened death to B.P. and her daughter.

[FN1] Other than the October 17, 2016 messages, the text messages that the state admitted into evidence are undated (aside from the labels of "Sunday," "Monday," and "Yesterday") and the state did not ask either B.P. or Detective Jaggers to clarify the dates on which B.P. received the messages.

{¶ 19} The next morning, on Monday, B.P. received messages from the same unknown number that said "Thanks for not being there you will get found [sic]" and "We goin together you my bitch mine [sic]." She testified that Clark came to her office that day, but someone told him that B.P. was not there. She believed that the second message meant that Clark was going to kill her and himself. B.P. said she was "petrified" when she received the messages because Clark "was off in crazy land again."

{¶ 20} On Monday evening, B.P. received six messages from a second phone number that she did not recognize. Among other things, the messages said "Call marcus or dont go to work tomorrow. u cheating on me. [sic];" "Im already dead im not going alone [sic];" and "U wont call so I guess ill c u tomorrow [sic]." She interpreted the messages to mean that Clark intended to look for her if she did not call him and that he intended to kill her and himself the next day.

{¶ 21} The final message that B.P. testified about came from a third phone number that B.P. did not recognize. It said, "Police can't help you bitch. Don't go on Reynolds. we both dead soon. End of story. In dead now both of us dead. this is sam bitch 8to5 [sic]." B.P. thought that Clark was threatening to come to her office, which is on Reynolds Road, to kill her and himself. B.P. testified that Clark knew that her work schedule was 8:00 a.m. to 5:00 p.m. She also said that she knows one person named Sam—her son-in-law—but she did not believe that the message came from him because he was respectful to her and had never spoken to her using threatening language.

{¶ 22} B.P. testified that the text messages made her fear for her life. She believed that Clark was going to cause her physical harm. As a result of the abuse inflicted by Clark, B.P. now attends personal and group counseling sessions. She still feared Clark at the time of trial and believed that he would kill her if he ever had the opportunity.

{¶ 23} On cross-examination, B.P. testified that, prior to the day her tires were slashed, she never called 911, filed a police report or pressed charges against Clark, or sought help from a domestic violence agency or shelter. She said that she reported the text messages because she "had the strength" and thought that Clark would kill her for leaving him. She admitted that Clark did not commit any acts of physical violence against her from October 17 to 31. She also admitted that she left Clark twice, but returned to the relationship because she was not strong enough and did not have the support she needed to stay out of the relationship. She confirmed that she lied to hospital staff and police regarding the source of her injuries in April 2009 even though she was away from Clark and in the safety of the hospital at the time.

{¶ 24} Regarding the incident where her tires were slashed, B.P. testified that she wanted to file charges against Clark, but the STPD did not pursue the case because the police were investigating the text messages and B.P. had already obtained a CPO against Clark.

{¶ 25} Defense counsel also asked B.P. about the text messages that she received from unfamiliar phone numbers. She testified that she reported the messages to police because of their content and because she thought that 22 messages sent over 15 days was an excessive amount of contact. B.P. again said that she believed that Clark sent the messages based on her prior communication with him. She also said that Clark occasionally referred to himself in the third person while speaking, so B.P. did not find it odd that he would refer to himself as "Marcus" in one of the text messages.

{¶ 26} On cross, B.P. said that she showed Detective Jaggers the text messages that were on her phone during Detective Jaggers's investigation. At the detective's request, B.P. said that she took screenshots of all of the messages she received from October 17 to 31 and emailed them to Detective Jaggers. She said that Detective Jaggers did not, however, ask her to have her phone forensically examined by the TPD. B.P. clarified on redirect that Detective Jaggers looked at the messages on B.P.'s phone and made the screenshots of the messages; B.P. just emailed the screenshots to Detective Jaggers.

{¶ 27} Detective Jaggers was the state's other witness. She testified that she is a domestic violence detective with the TPD. She first received a report about the text messages on October 17. The report noted that there was a history of violence between the parties and that B.P. started receiving the messages after she broke up with Clark. Detective Jaggers did not initially interview B.P. After both the TPD and the STPD received more reports from B.P. about threatening text messages, Detective Jaggers conducted an investigation. She interviewed B.P. on October 28, 2016, during which B.P. was very emotional. B.P. told Detective Jaggers about the incidents of violence that B.P. testified to at trial, but Detective Jaggers did not include a description of the events in her report. B.P. also showed Detective Jaggers the text messages on her work phone. Detective Jaggers took screenshots of the messages to preserve them and had B.P. email the screenshots to her; the screenshots that arrived in Detective Jaggers's email (and were admitted into evidence at the trial) were the same screenshots that Detective Jaggers made on B.P.'s phone. Detective Jaggers did not ask B.P. to submit the phone for forensic testing.

{¶ 28} Detective Jaggers testified that TPD uses a method of retrieving data from cellphones that she referred to as a "phone dump." The process requires the officer conducting the retrieval to download all of the data on the phone; the officer cannot download only the data that might have evidentiary value. TPD does not have a policy about retrieving cellphone data from victims. Rather, a phone dump is conducted at the investigating detective's discretion and requires the victim to consent to the process. Detective Jaggers chose not to ask B.P. to consent to a phone dump.

{¶ 29} Detective Jaggers also testified that she requested phone records from the cellphone service providers for B.P.'s work phone and the three unknown numbers that the text messages came from, but she was not able to obtain them. She said that neither

phone records nor phone dump data could tell her who was holding the phone that sent the messages to B.P.

{¶ 30} Finally, Detective Jaggers said that, based on her knowledge of and experience with domestic violence victims, she did not find it unusual that B.P. did not contact police about the abusive behavior or call 911 when she was injured, stayed with Clark for many years and returned to the relationship after leaving, and lied about the cause of her April 2009 injuries.

{¶ 31} Clark's cross-examination mainly focused on the deficiencies that he perceived in Detective Jaggers's investigation. Detective Jaggers admitted that speaking to B.P. was the extent of her investigation. She did not interview Clark about the text messages either before filing the charges or after Clark was arrested and held in jail, nor did she interview B.P.'s daughter, friends, or neighbors.

{¶ 32} Detective Jaggers confirmed that she learned about the incidents of violence to which B.P. testified during her interview with B.P., but she did not put the incidents in a written report at that time. Detective Jaggers said that she conducted another interview with B.P. on January 19, 2017—11 days before trial—in order to get a comprehensive list of violent incidents between Clark and B.P. She confirmed that B.P.'s failure to report the abuse or leave Clark was not unusual behavior in a domestic violence victim. She also confirmed that her supplemental report did not note any incidents of violence after 2009 and that Clark did not commit any acts of violence against B.P. from October 17 to 31, 2016. B.P. did not report receiving any threatening text messages between the time she left Clark in August 2016 and the time she received the first threatening message on October 17, 2016.

{¶ 33} Regarding her choice not to collect the data from B.P.'s work cellphone, Detective Jaggers testified that she opted not to request a phone dump because of concerns about the business information on the phone. She believed that preserving the text messages in photographs and subpoenaing phone records would be sufficient evidence. She also admitted that she did not receive any of the phone records that she subpoenaed from the cellphone companies. To follow up on the subpoenas, Detective Jaggers called one of the companies to ask about the records and told prosecutors that she had not received the records. Detective Jaggers was not called into court for a hearing about enforcing the subpoenas. Detective Jaggers said that she did not apply for search warrants for B.P.'s work cellphone or for the cellphones associated with the three unidentified telephone numbers. Without the phone records, Detective Jaggers was not able to identify the people to whom the unknown phone numbers belonged.

{¶ 34} Detective Jaggers testified that there are programs available that allow users to "spoof" phone calls and text messages—i.e., make the calls and messages appear to be coming from a phone number different from the number that was actually calling or sending the messages. She admitted that there was a possibility that the messages B.P. received had been sent from a spoofed number. Although Detective Jaggers said that calling the phone numbers may have provided insight on who they belonged to and

whether the text messages were from spoofed numbers, she did not call any of them during her investigation.

{¶ 35} After hearing the evidence, the jury found Clark guilty of menacing by stalking, including the history-of-violence element. On February 17, 2017, the trial court sentenced Clark to 17 months in prison.

*State v. Clark*, 106 N.E.3d 256, 257-263 (Oh. Ct. App. 2018).

## A. Direct Appeal

On May 27, 2017, Clark, through new counsel, appealed to the Sixth District Court of

Appeals, Lucas County, Ohio.  Doc. 14-1, p. 87.  In his brief, he raised the following

assignments of error:

> 1. The court committed reversible error when it denied Defendant's Motion to Dismiss or order sanctions against the state for failure to timely provide evidence to be used in the state's case in chief.
>
> 2. The state failed to provide legally sufficient evidence to sustain an indictment or conviction for the enhanced offense of menacing by stalking, a felony of the fourth degree.
>
> 3. Appellant's conviction for menacing by stalking, a felony of the fourth degree, was against the manifest weight of the evidence.

Doc. 14-1, p. 94.  On February 9, 2018, the Ohio Court of Appeals affirmed the trial court's

judgment.  Doc. 14-1, pp. 184-203.

Clark did not timely appeal to the Ohio Supreme Court.

## B. Motion for Delayed Appeal

On April 10, 2018, Clark, pro se, filed a notice of appeal and a motion for leave to file a

delayed appeal in the Ohio Supreme Court.  Doc. 14-1, pp. 204, 207.  On June 6, 2018, the Ohio

Supreme Court denied Clark's motion for leave to file a delayed appeal and dismissed his case.

Doc. 14-1, p. 233.

## C. State Habeas Petition

On July 23, 2018, Clark, pro se, filed a petition for a writ of habeas corpus in the Ohio

Supreme Court.  Doc. 14-1, p. 234.  In his brief, he raised the following assignments of error:

> 1. The court committed reversible error when it denied Defendant's Motion to Dismiss or order sanctions against the State for failure to timely provide evidence to be used in the State's case in chief.

> 2. The state failed to provide legally sufficient evidence to sustain an indictment or conviction for the enhanced offense of menacing by stalking, a felony of the fourth degree.

> 3. Appellant's conviction for menacing by stalking, a felony of the fourth degree was against the manifest weight of the evidence.

Doc. 14-1, p. 236.  On September 26, 2018, the Ohio Supreme Court considered the petition "in a manner prescribed by law" and dismissed the case.  Doc. 14-1, p. 295.

### D. Post-Conviction Petition

On October 16, 2018, Clark, pro se, filed a petition to vacate or set aside judgment of conviction or sentence in the state trial court.  In his petition, Clark raised the following claim:

> 1. Petitioner is not guilty of M1 or/and F4 Menacing by Stalking. Victim was not telling the truth about petitioner. If petitioner had effective Assistance of counsel, petitioner would not have been convicted and imprisoned.

Doc. 14-1, p. 296.  On December 28, 2018, Clark filed a supplemental motion for post-conviction relief seeking to add a claim of ineffective assistance of counsel.  Doc. 14-1, pp. 308-309.  On March 15, 2019, the trial court issued an opinion denying Clark's petition as untimely.  Doc. 14-1, pp. 321-325.  Clark did not file an appeal.

### E. Federal Habeas Petition

On April 26, 2019, Clark, pro se, filed a Petition for a Writ of Habeas Corpus.  Doc. 1.  He listed the following grounds for relief:

> **Ground One**: The court committed reversible error when it denied Defendant's Motion to dismiss or order sanctions against state for failure to timely provide evidence to be used in state's case in chief.
> **Supporting facts:** On 11/14/16, Defense counsel requested discovery. On 11/28/16, the State responded that the state was going to use Defendant's prior convictions (99CRB18716 and CR2000-2661) to prove Defendant has a "history of

9

violence" towards victim. On 1-10-17, the prosecution disclosed to defense counsel that Defendant's prior convictions did not involve the same victim, and would not be used to prove enhancement element. On 1-17-17, Defendant filed 3 motions, including a Request for a Bill of Particulars, Notice of Intent to use evidence, and Demand for Discovery. 1-19-17, State had Det. Jaggers interview victim again for "history of violence" report. 1-23-17, report was provided to defense, the day before trial.

**Ground Two**: The State failed to provide legally sufficient evidence to sustain an indictment or conviction for the enhanced offense of menacing by stalking, a felony of the fourth degree.

    **Supporting facts:** The state did not use the evidence presented to the grand jury of prior convictions of violence. Without the prior convictions or the supplement police report which was not prepared until 1-19-2017, there was no evidence presented to the defense to support the indictment and the statement provided to the police was completely uncorroborated and unsubstantiated with medical records, prior police reports, witness statements (i.e. statement of people who observed the injuries after the fact, such as family or co-workers), or the like.

**Ground Three**: Ineffective assistance of counsel (Both trial and appellate).

    **Supporting facts:** The evidence that the State used to prove a "history of violence" enhancement element was Testimony of the victim. Detective Jaggers also testified at trial. I had proof that the victim did not tell the truth about a July 2007 incident that I was to have been violent towards her. I informed my trial attorney and my appellate attorney that the so-called victim was in court committing perjury, but they failed to disclose that information to the court[s].

**Ground Four**: Appellant's conviction for menacing by stalking, a felony of the fourth degree, was against the manifest weight of the evidence.

    **Supporting facts:** Absent the use of defendant's prior convictions as proof of the "a prior violent history," and by relying solely on uncorroborated, unsubstantial, unsworn narrative of the victim, provided at the last minute, without an overt act during the time period of the indictment, that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.

Doc. 1, pp. 6-11. Respondent filed a Return of Writ (Doc. 19) and Clark filed a Traverse (Doc. 15, 20).

## II. Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner must meet certain procedural requirements in order to have his claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and

exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001).  Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Failure to exhaust applies when state remedies are "still available at the time of the federal petition."  *Id.* at 806 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).  In contrast, when state court remedies are no longer available, procedural default rather than exhaustion applies.  *Williams*, 460 F.3d at 806.

**Exhaustion.**  A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court.  28 U.S.C. § 2254(b)(1)(A).  A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action.  28 U.S.C. § 2254(b),(c); *Anderson v. Harless*, 459 U.S. 4, 6  (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003) ("Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts")).  A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  In order to satisfy the fair presentation requirement, a habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts.  *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  This means that the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law.  *See, e.g.*, *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987).

**Procedural Default.**  Procedural default may occur in two ways.  *Williams*, 460 F.3d at 806.  First, a petitioner procedurally defaults a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court."  *Id.*  In *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), the Sixth Circuit provided four prongs of analysis to be used when determining whether a claim is barred on habeas corpus review due to petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error.  *See also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848).  "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id.*  While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson,* 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review.  *Williams,* 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered. *Coleman*, 501 U.S. at 750.

**Merits Review.** In order to obtain habeas relief under 28 U.S.C. § 2254, a petitioner must show either that the state court decision (1) resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law as determined by the United States Supreme Court ("contrary to" clause); or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings ("unreasonable application" clause). 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant a writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or [based on] a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "Clearly established federal law" refers to the holdings, not dicta, of the Supreme Court's decisions as of the time of the relevant state court decision, as well as legal principles and standards flowing from Supreme Court precedent. *Id.* at 412; *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). A state court is not required to cite Supreme Court precedent or reflect an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey*

*v. Musladin*, 549 U.S. 70, 77 (2006); *White v. Woodall*, 572 U.S. 415, 426 (2014) ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.") (emphasis in original).

In determining whether the state court's decision involved an unreasonable application of law, the court employs an objective standard. *Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "A state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

**Ineffective Assistance of Counsel.** The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs ineffective assistance of counsel claims. A petitioner must show that counsel was objectively unreasonable and a reasonable probability that, but for counsel's unreasonable failure, the result of the proceedings would have been different. *Id*., at 687-691, 694. Upon federal habeas review, there is a double layer of deference applied: to counsel, under *Strickland*, and to the state court of appeal's decision on the merits of that claim, under AEDPA. *Kelly v. Lazaroff*, 846 F.3d 819, 832 (6th Cir. 2017) (citing *Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). The *Strickland* standard also applies to an ineffective assistance of appellate counsel claim. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

### III. Analysis

**A. Ground One is not cognizable and/or is procedurally defaulted.**

In Ground One, Clark argues that the trial court erred when it denied his motion to dismiss or sanction the state for failing to timely provide evidence it used at trial. Doc. 1, p. 6. The evidence at issue was a supplemental report created by investigating Detective Jaggers detailing the victim's allegations of Clark's history of violence against her. Doc. 1, p. 6. These allegations, in turn, provided the basis for a history of violence element that made the menacing charge a fourth-degree felony. *See Clark*, 106 N.E.3d at 265.

Ground One alleges a violation of Ohio Crim. R. 16, which is not cognizable on federal habeas review. See Doc. 14-1, pp. 103-106 (Clark's brief on direct appeal alleging a violation of Ohio Crim. R. 16); Doc. 15, pp. 3-4 (Clark's Traverse relying on Ohio Crim. R. 16); *Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002) (alleged violation of Crim. R. 16 does not describe a constitutional violation); *Hicks v. Collins*, 384 F.3d 204, 220 (6th Cir. 2004) (same); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (issues of state law are not cognizable on federal habeas corpus review).

Additionally, Ground One is procedurally defaulted because Clark did not timely file an appeal to the Ohio Supreme Court on direct review, *i.e.*, he did not pursue this claim through the state's "ordinary appellate review procedures." *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848); *Williams v. Mitchell*, 792 F.3d 606, 613 (6th Cir. 2015) (a petitioner must present his claim to the Ohio Court of Appeals and the Ohio Supreme Court). Although Clark filed a motion for delayed appeal in the Ohio Supreme Court, the Ohio Supreme Court denied his motion, which constitutes a procedural ruling. *See Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004) (a motion for delayed appeal denied by the Ohio Supreme Court constitutes a procedural ruling that renders a federal habeas petitioner's claim procedurally defaulted). Therefore, this

ground is procedurally defaulted.

The fact that Clark raised this claim in his state habeas petition, Doc. 14-1, p. 236, does not remedy his procedural default.  Because the Ohio Supreme Court dismissed his state habeas petition without explanation, the Court assumes it applied a procedural bar; namely, that Clark's claims were barred by res judicata because he raised them on direct appeal, lost in the state court of appeals, and did not appeal that ruling.  *See, e.g., Daniel v. State*, 786 N.E.2d 891, 893 (Ohio 2003) ("habeas corpus is not a substitute for appeal or postconviction relief"); *State ex rel. Rash v. Jackson*, 807 N.E.2d 344 (Ohio 2004) (a defendant may not use state habeas corpus "to gain successive appellate reviews of the same issue" raised on direct appeal); *Hamilton v. Gansheimer*, 536 F.Supp.2d 825, 832 (N.D.Ohio 2008) (res judicata bars claims raised anew in an Ohio habeas petition and federal habeas courts presume the Ohio Supreme Court enforced the procedural bar when it summarily denied petition, citing *Simpson v. Sparkman*, 94 F.3d 199, 203 (6th Cir. 1986)).

Clark does not allege cause to excuse his procedural default.  Respondent identifies exhibits Clark had filed with his motion for leave to file delayed appeal as potentially alleging cause as to why he failed to timely appeal: a letter to Clark from his court-appointed appellate counsel and a letter from the Ohio Supreme Court, both in response to correspondence Clark had sent.  Doc. 19, p. 26 (referencing Doc. 14-1, pp. 210-212).  However, as Respondent observes, the letters do not show that Clark's court-appointed appellate attorney failed to timely inform him of the Ohio Court of Appeals' decision or that he was prohibited from timely filing an appeal.  Rather, the letters show that Clark knew about the Ohio Court of Appeals' unfavorable decision, but instead of timely filing an appeal pro se, he chose to further correspond with counsel and the Ohio Supreme Court, seeking intervention and/or advice.  Thus, Clark has not demonstrated cause to excuse his procedural default.

Clark also fails to show actual prejudice that resulted from an alleged violation of federal law. *Coleman*, 501 U.S. at 750. As the Ohio Court of Appeals observed, the state did not violate Crim. R. 16 since the state could not have provided Clark with Detective Jaggers' supplemental report because the report did not exist when Clark asked for it. *Clark*, 106 N.E.3d at 265. The Ohio Court of Appeals further noted that once the detective wrote her supplemental report and Clark was provided with it, the trial court continued the trial for a week to give Clark's attorney time to investigate the statements and prepare for trial. Clark's attorney stated before trial began that he had all the information he needed to proceed. Clark's attorney was able to, and did, thoroughly cross-examine the victim about the incidents of violence, and he was able to, and did, cross-examine Detective Jaggers about the timing and completeness of her investigation. *Id.*

Finally, Clark has not shown a fundamental miscarriage of justice if his claim is not considered. *Coleman*, 501 U.S. at 750. To do so he must show that his is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). A claim of actual innocence "requires the petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995). Clark asserts that he was in prison in July 2007, a time period within which the victim had testified at trial that Clark was violent towards her. Doc. 15, p. 7. First, Clark does not submit evidence showing he was incarcerated in July 2007. Second, such evidence would not be new because it was known to Clark at trial.[3] Moreover, even if Clark was in prison in July 2007, he does not allege that he did not commit the described act, only that he could not

---

[3] Indeed, Clark's counsel successfully sought to keep the victim from commenting at trial upon Clark's past criminal record and incarceration. See Doc. 14-1, p. 431.

have done it in July 2007.  Nor does he allege or submit evidence showing that he was in prison on the three other occasions the victim stated that Clark committed violent acts against her.[4]  In other words, Clark does not show that he is innocent of the crime he was convicted of: menacing by stalking with a history of violence.  Ground One is not cognizable and procedurally defaulted.

### B. Ground Two is procedurally defaulted

In Ground Two, Clark alleges that there was insufficient evidence to sustain his indictment or conviction.  Doc. 1, p. 8.  As with Ground One, Ground Two is procedurally defaulted.  Clark failed to pursue this claim through the state's ordinary appellate review procedures when he failed to timely appeal to the Ohio Supreme Court and the Ohio Supreme Court denied his motion for delayed appeal.  *Williams*, 460 F.3d at 806; *Bonilla*, 370 F.3d at 497.

As above, Clark does not show cause to excuse his procedural default.  Nor does he show prejudice.  He complains that the evidence at trial consisted of the victim's testimony and that the state did not pursue evidence available to it, such as a "phone dump" of the victim's phone.[5]  Doc. 15, pp. 4-8; Doc. 20.  But, as the Ohio Court of Appeals explained, the history of violence element in a menacing by stalking charge can be satisfied by testimony alone.  *Clark*, 106 N.E.2d, at 265.  And the record shows that the trial court was willing to delay trial to permit Clark to obtain a "phone dump" from the victim's cell phone but that trial counsel, after consulting with Clark, advised that he did not want a "phone dump" and preferred to proceed to trial without one:

> THE COURT : Thank you. I think that there was also a clarification then. One of the remedies that the Court had would have been to allow there to be the phone dump and to offer a continuance. And then, Mr. Hasbrook, you no longer requested that.

---

[4] When the victim was asked at trial to recount a violent act that occurred in July 2007, over the course of her almost nine-year relationship with Clark, she stated, "Two thousand seven, I think we was on -- it's 7, we was on -- we moved from -- sorry, ma'am. A lot of my years don't come into play what years they are."  Doc. 14-1, p. 619.

[5] In a "phone dump," transcripts of cellular data (phone calls, text messages) from a cell phone are obtained.  Doc. 14-1, p. 394.

MR. HASBROOK: Yes, Your Honor. And if you would allow me to confirm with my client once again?

THE COURT: Thank you. Off the record.

(Discussion held off record.)

THE COURT: Thank you.

MR. HASBROOK: Yes, Your Honor. The position remains the same. We have withdrawn the request for T.P.D. to do a so-called phone dump or deep dive into the cell phone.

See Doc. 14-1, p. 432.  In short, Clark does not show actual prejudice that resulted from an alleged violation of federal law.

Finally, Clark does not show manifest injustice.  Ground Two is procedurally defaulted.

**C. Ground Three is procedurally defaulted; additionally, a portion of Ground Three fails on the merits**

In Ground Three, Clark alleges ineffective assistance of trial counsel and appellate counsel.  Clark submits that he told both counsel that the victim committed perjury when she testified that Clark was violent towards her in July 2007.  He explains that he was in prison in July 2007.  He asserts that counsel did not disclose this information to the court.  Doc. 1, p. 9.

*Ineffective assistance of trial counsel*.  The ineffective assistance of trial counsel claim is procedurally defaulted because, although Clark raised this claim in his post-conviction petition, the trial court denied his petition as untimely.[6]  *See Smith v. Warden, Toledo Corr. Inst*., 780 Fed. App'x 208, 219-220 (6th Cir. June 16, 2019) (an Ohio postconviction petition deemed untimely is an independent and adequate state ground for denying relief; petitioner's claim was therefore procedurally defaulted); *Hill v. Mitchell*, 2006 WL 2807017, at *45-48 (S.D.Ohio Sept. 27, 2006) (collecting cases).  Additionally, Clark never appealed the trial court's ruling, thereby committing a second form of procedural default.  *Williams*, 460 F.3d at 806; *O'Sullivan*, 526

---

[6] Because Clark's ineffective assistance of trial counsel claim is based on evidence outside the record, he properly raised it in a post-conviction petition.

U.S. at 848.  As above, he does not show cause to excuse his procedural default, prejudice, or actual innocence.  This claim is procedurally defaulted.

*Ineffective assistance of appellate counsel*.  Clark's ineffective assistance of appellate counsel claim fails on the merits.  Evidence outside the record is not the proper basis for a direct appeal.  *State v. Spaulding*, 89 N.E.3d 554, 575 (Ohio 2016), citing *State v. Madrigal*, 721 N.E.2d 52, 65 (2000).  Therefore, appellate counsel cannot be ineffective for failing to raise an issue on direct appeal based on evidence outside the record.  *See, e.g., State v. Croom*, 2014 WL 1877457, at *3 (Ohio Ct. App. May 1, 2014) ("a claim requiring such proof that exists outside of the trial record cannot appropriately be considered on a direct appeal…. it is not a basis for reopening the direct appeal on the theory that appellate counsel rendered ineffective assistance in failing to raise that issue." citing cases); *State v. McNeal*, 2002 WL 31031672, at *3 (Oh. Ct. App. Sept. 10, 2004) ("because McNeal's argument relies upon matters outside the record of trial, it would have been inappropriate for [appellate] counsel to have assigned error with respect to this issue" on direct appeal, citing cases); *Sheppard v. Bagley*, 604 F.Supp.2d 1003, 1115 (S.D. Oh. 2009) ("had appellate counsel attempted to raise the systemic discrimination claim on direct appeal, the state courts would unquestionably have rejected it as one relying on evidence outside the record because such claims are not cognizable on direct appeal in Ohio.").

To the extent an ineffective assistance of appellate counsel claim could have been raised in a postconviction petition, Clark procedurally defaulted any such claim because his petition was denied as untimely and he did not appeal the trial court's ruling.  He does not show cause, prejudice, or manifest injustice.  Ground Three fails on the merits and/or is procedurally defaulted.

### D. Ground Four is not cognizable and is procedurally defaulted

In Ground Four, Clark argues that his conviction was against the manifest weight of the

evidence.  Doc. 1, p. 11.  Ground Four is not cognizable because federal habeas corpus relief is available only to correct federal constitutional violations, 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 US 1, 5 (2010), and a claim that a conviction is against the manifest weight of the evidence rests solely on state law.  *See Ross v. Pineda*, 2011 WL 1337102, at *3 (S.D. Oh. April 11, 2011) ("Whether a conviction is against the manifest weight of the evidence is purely a question of Ohio law," citing *State v. Thompkins*, 678 N.E.2d 541 (Ohio 1997)).

Moreover, for the same reasons as discussed above regarding Grounds One and Two, Ground Four is procedurally defaulted.  Clark failed to pursue this claim through the state's ordinary appellate review procedures when he failed to timely appeal to the Ohio Supreme Court and the Ohio Supreme Court denied his motion for delayed appeal.  *Williams*, 460 F.3d at 806; *Bonilla*, 370 F.3d at 497.  In addition, he fails to demonstrate cause, prejudice, and manifest injustice.

### IV. Conclusion and Recommendation

For the reasons stated above, the undersigned recommends that Clark's habeas Petition be **DISMISSED in part and DENIED in part**.

Dated: April 24, 2020

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).